UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v.           )<br>)<br>BINTU TOURE,          )<br>)<br>Defendant  ) | Criminal No. 1:19-10369-MLW |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Acting United States Attorney, by and through the undersigned Assistant United States Attorneys, hereby respectfully submits this memorandum in connection with the sentencing of the defendant in this case, Bintu Toure ("Toure" or "Defendant"). As set forth below, the government recommends a sentence of 17 months incarceration, 24 months supervised release, and a forfeiture money judgment in the amount of $552,445.17.

**I.    FACTUAL BACKGROUND**

The Pre-sentence Investigation Report ("PSR") accurately summarizes Toure's offense conduct, and the government will not recite it here. PSR ¶¶ 7-34.

**II.   THE ADVISORY SENTENCING GUIDELINES**

In calculating the defendant's offense level under the sentencing guidelines, the PSR groups the two counts of conviction (wire fraud and money laundering conspiracy) together, and uses the higher offense level for the money laundering conspiracy count. PSR ¶¶ 38 – 40. The PSR calculates the base offense level for the money laundering conspiracy count as 20, based on a money laundering base of 6; applies a 2-level enhancement for the defendant's conviction under 18 U.S.C. § 1956; applies a 2-level enhancement for sophisticated laundering; and finally applies a 3-level reduction for the defendant's acceptance of responsibility, resulting at a total

offense level of 21. *Id.* ¶ 49 – 53. With the defendant's criminal history category of I, this results in a guidelines sentencing range ("GSR") of 37-46 months.

There is a plea agreement in this case. ECF No. 6 ("Plea Agreement"). In the plea agreement, the government calculates the defendant's total offense level differently than the PSR: the government calculates Toure's total offense level as 22, with the key difference being that the government calculates the base offense level for the money laundering conspiracy count as 21, using the base offense level of 7 for the wire fraud count, *i.e.*, the "underlying offense" that generated the laundered funds. This difference is highlighted in the chart below:

| USSG | Gov't. | PSR |
|---|---|---|
| **§ 2B1.1(a)(1) – *Wire Fraud Base*** | 7 | 7 |
| § 2B1.1(b)(1)(H) – *Loss (> $550,000)* | +14 | +14 |
| § 2B1.1(b)(10) – *Sophisticated means (fraud)* | - | +2 |
| **§ 2S1.1(a)(1) – *Money Laundering Base*** | 7 | 6 |
| • Gov't using base offense level of 7 based on § 2B1.1(a)(1) <br> • PSR using base offense level of 6 based on § 2B1.1(a)(2) | | |
| § 2B1.1(b)(1)(H) – *Loss (> $550,000)* | +14 | +14 |
| § 2S1.1(b)(2)(B) – *Conviction for § 1956* | +2 | +2 |
| § 2S1.1(b)(3) – *Conviction for § 1956(h) and sophisticated laundering* | +2 | +2 |
| Adjusted Offense Level (Subtotal) | 25 | 24 |
| § 3E1.1(a) and (b) – *Acceptance of Responsibility* | -3 | -3 |
| **Final Adjusted Offense Level** | 22 | 21 |

The government has objected to the PSR on this point. As set forth below, the plain language and purpose of § 2S1.1 support using the wire fraud base of 7 as the starting point for the money laundering conspiracy offense level here.

    A.  <u>Section 2S1.1 Requires Direct Money Launderers To Be Punished More (Not Less) Than Those Who Solely Commit the Underlying Offense</u>

In adopting § 2S1.1, the Commission made clear that its express purpose was to ensure that "*all direct money launderers will receive an offense level that is one to four levels greater*

*than the Chapter Two offense for the underlying offense.*"[1]  *See* Guidelines Supp. to Appx. C ("Commission Policy"), amend. 634, at 230 (Nov. 1, 2001), *available at* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/APPCSUPP.pdf ("[T]his amendment provides for three alternative enhancements . . . [that] are designed to (1) ensure that all direct money launderers receive additional punishment for committing both the money laundering offense and the underlying offense...").

To accomplish this mandate, the Commission directs courts to calculate the underlying offense for direct money launderers as follows:

> For direct money launderers . . . subsection (a)(1) sets the base offense level at the offense level in Chapter Two (Offense Conduct) *for the underlying offense* (*i.e.*, the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense).

Commission Policy at 229 (emphasis added); *see also* U.S.S.G. § 1B1.5(b)(1) ("An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline.").

In other words, § 2S1.1(a)(1) requires an independent calculation using the complete substantive guideline for the underlying offense – including any instructions or references contained therein – before turning to the money laundering guideline.  *See United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006) (holding that § 2S1.1(a) requires that "before considering what money-laundering adjustments to apply to [defendant]'s sentence, the court first had to calculate the sentence as it would have applied to the [underlying] extortion counts *standing alone*, making reference to [the underlying extortion guideline]" before returning to

---

[1] In adopting Section 2S1.1, the Commission defined direct money launders to be offenders, like Toure, "who commit or would be accountable . . . for the underlying offense which generated the criminal proceeds."  Commission Policy at 229.

3

§ 2S1.1) (emphasis added); *see also United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) ("The total Guidelines offense level for such 'underlying offense,' *after being independently calculated* by applying all appropriate adjustments, and considering any relevant conduct under U.S.S.G. § 1B1.3 . . . is then used as the base offense level for money laundering . . . .") (emphasis added and citation omitted). After all, as the Seventh Circuit aptly stated: "[a]dding levels for 'all' direct launderers is possible only if . . . § 2S1.1(a)(1) plugs the full offense level for the substantive guideline into the 'base' level for money laundering." *United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009).

Here, when analyzing the fraud offense as a standalone count, the PSR correctly calculates the base offense level for the underlying offense as 7, because Toure was convicted of an offense "referenced to this guideline" [*i.e.*, wire fraud] and that offense has a statutory maximum term of imprisonment of 20 years or more. *See, e.g.*, PSR ¶ 40. Because the loss amount is more than $550,000, but not more than $1,500,000, the offense level for the fraud count is increased by 14 levels to 21.[2]

Following the Commission's directive, this offense level of 21 should then be used as the "base" level for money laundering. *See, e.g.*, *Cruzado-Laureano*, 440 F.3d at 48 (holding that the district court, after determining the underlying offense level standing alone, "was only then required to return to 2S1.1 (and specifically to 2S1.1(b)) to determine if further adjustments were

---

[2] In the plea agreement, the government agreed to a total offense level calculation that included a 2-level enhancement for sophisticated laundering pursuant to § 2S1.1(b)(3), but did not include the PSR's enhancement for sophisticated means in connection with the wire fraud pursuant to § 2B1.1(b)(10). *Compare* PSR ¶ 40 *with* Plea Agreement ¶ 3. In keeping with its agreement, the government believes that only one 2-level enhancement for sophisticated means should apply, and thus has objected to the inclusion of the 2-level enhancement for sophisticated means in connection with the wire fraud in paragraph 40. This avoids double-counting the 2-level enhancement when the money laundering conspiracy offense level is properly calculated pursuant to § 2S1.1, as described above.

necessary under that provision"). Accordingly, here, the money laundering base offense level – *i.e.*, 21 – should then be increased by 2 levels since the defendant was convicted of violating 18 U.S.C. § 1956. *See, e.g.*, *United States v. Rushton*, 738 F.3d 854, 858 (7th Cir. 2013) ("The offense level for money laundering in violation of 18 U.S.C. § 1956 (as in the present case) levitates from the underlying offense (the crime that produced the money that the defendant laundered) by adding 2 levels to the total offense level for that offense.") (parentheticals in original). To this, the 2-level enhancement for sophisticated laundering, under § 2S1.1(b)(3), is added. *See* PSR ¶ 45. These enhancements result in an adjusted offense level of 25, which, after a 3-level downward adjustment for acceptance of responsibility, results in a total offense level of 22.

  B. <u>The PSR's Money Laundering Guideline Calculation Has Been Expressly Rejected</u>

  The PSR suggests that – even though the correct base offense level for the underlying offenses would be 7 if calculated independently, *see* PSR ¶ 40 – since Toure was a direct money launderer her base offense level should be 6. PSR ¶ 41. To reach this conclusion, rather than calculating the underlying offense level standing alone, the PSR cross references the money laundering statute when calculating the underlying fraud offense, as detailed below:

> Pursuant to §2B1.1, Application Note 2(A), for purposes of subsection (a)(1), an offense is 'referenced to this guideline' if (i) this guideline is the applicable Chapter Two guideline specifically referenced in Appendix A for the offense of conviction, as determined under the provisions of § 1B1.2; or in the case of a conviction for conspiracy, solicitation, or attempt to which § 2X1.1 applies, this guideline is the appropriate guideline for the offense the defendant was convicted of conspiring, soliciting, or attempting to commit. The offense of conviction in this case is Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h). The Statutory Index at Appendix A references USSG §2S1.1 only for this offense of conviction, so neither subsection (i) or (ii) to Application Note 2(A) are applicable.

*Id.* ¶ 42.

5

Courts have rejected this approach. *See, e.g.*, *United States v. Salado*, 590 Fed. Appx. 692, 693 (9th Cir. 2015) (base offense level 7 where defendant convicted of money laundering offense and an offense referenced to § 2B1.1); *United States v. Nikolovski*, 565 Fed. Appx. 397, 401-02, n.4 (6th Cir. 2014) (same); *United States v. Mirzoyan*, 2017 WL 1501394, at *18 (S.D.N.Y. Apr. 26, 2017) (same).

The reason is clear: § 2B1.1's entire offense guideline – including using the fraud (not money laundering) statute when applying the instructions to determine the "referenced to this guideline" prong of Application Note 2(A) – is the only way to independently calculate the underlying offense level. *See Hodge*, 558 F.3d at 637 (holding that, while "[u]sing the guideline (including its adjustments) for one offense as the 'base' level for another [*i.e.*, § 2S1.1(a)(1)] is an unusual approach," the Commission has plainly explained that courts must use "the complete substantive guideline" including all "cross references, and special instructions *for the underlying offense*.") (emphasis and brackets added).

Moreover, the PSR's calculation runs contrary to the approach taken by the Probation Office in previous cases in this district involving a direct money launderer. *See, e.g., United States v. Patel*, No. 19-cr-10381-LTS (Jan. 13, 2020), PSR ¶ 32 (recommending a fraud base offense level of 7, not 6, when calculating the base offense level for a direct money launderer); *United States v. Eze*, 19-cr-10352-LTS (Dec. 30, 2019), PSR ¶ 37 (same); and *United States v. Abell*, 17-cr-10332-NMG (Jan. 4, 2019), PSR ¶¶ 41-42 (same). There has been no intervening change in the law that would justify changing this practice now.[3]

---

[3] The Probation Office has taken this different approach (*i.e.*, starting with a base offense level of 6) in more recent cases. *See, e.g., United States v. Janavs*, 19-cr-10080-12-NMG. And other sessions of this Court have agreed with that approach. *See, e.g., Janavs*, Sentencing Tr., ECF No. 872 at 9 (adopting base level of 6, but describing calculation as "academic and irrelevant to the ultimate sentence that will be imposed" by the Court); *United States v. Hodge*,

For these reasons, the government submits that Toure's total offense level, correctly calculated, is 22. This results in a GSR of 41 – 51 months.

## III.   3553(a) FACTORS

In determining a defendant's sentence, the Court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the court should consider the various factors set forth in 18 U.S.C. § 3553(a). In recommending a sentence of 17 months, the government has taken all relevant factors into account, including but not limited to the nature of the offense, the defendant's history and characteristics, and the need to afford adequate deterrence. These factors are considered below.

With respect to the nature of the offense, it amounts to exploiting the Internet and means of modern commerce to steal money from innocent victims. In total, victims wired over $600,000 to fraudulent bank accounts that were controlled by Toure and her co-conspirators. PSR ¶¶ 33 – 34.[4] While Toure was not in contact with the victims or directly involved with the spoofed emails that tricked them into wiring their money, she was nevertheless a willing and active participant in the scheme. Indeed, the scheme could not have worked without her: she was the one who went into Braintree city hall at the onset, to obtain a fraudulent business certificate in the name of "BRF Global, S.A."; she was the one who then took that fraudulent certificate into

---

19-cr-10080-11-NMG, Sentencing Tr., ECF No. 840 at 15 (same); *United States v. Kapoor*, 16-cr-10343-7-ADB, Sentencing Tr., ECF No. 1175 at 6 (adopting base level of 6 based on "probation's rationale" without discussion, where GSR was 151 – 188 months).

[4] As noted in the PSR, in February 2020, $76,673.75 that had been frozen by TD Bank was returned to Victim Company A from one of the fraudulent accounts, thus lowering the total loss amount to $552,445. PSR ¶ 35.

7

multiple banks to open fraudulent accounts, to receive and launder the proceeds of the scheme; and she was the one who went into those banks to wire the proceeds to co-conspirators overseas, and took money from the accounts in structured withdrawals. She was also the one who recruited two friends to open fraudulent bank accounts. And her crimes were serious, with real impact on the lives of her victims.

Take, for example, the owner of the company identified in the Information as "Victim A." As described in a victim impact statement (submitted in connection with the case against Toure's co-conspirator Yannick Minang), this business owner has lived through "a nightmarish experience regarding [the] fraudulent behavior." *See* Exhibit 1. The co-conspirators were "able to intercept emails [Victim Company A] sent to a Brazilian Chicken Producer and [were] able to direct the payments to [Minang's] accounts." This victim identifies $283,500 that was paid to a fraudulent account that Toure had opened and controlled.[5] In addition to the significant out-of-pocket losses, this victim also identifies the loss of business, as "[p]romises made to end buyers were not fulfilled and caused significant embarrassment to us and loss of revenue." *Id.* This underscores the seriousness of the offense, and it is reflected in the government's recommendation of jail time for Toure.

The government has also taken into account Toure's history and characteristics, as set forth in the PSR. This is Toure's first and only criminal conviction. Toure presents with a difficult family history; while it is fair and appropriate to take these factors into account, they are no excuse for her crimes. Moreover, the PSR makes clear that Toure did not suffer any of the financial hardships that are often present in the backgrounds of other defendants who come

---

[5] This victim impact statement also identifies a payment for a second shipment of $565,110, but Toure was not involved with that payment or bank account.

before the Court.  Rather, she was desperate for money when her father cut her off financially, and she took advantage of an opportunity – presented by Yannick Minang – that she knew was too good to be true.  It was clear that she was involved in a criminal scheme, but she persisted, and she did not stop until she got caught by the FBI.

Finally, the sentence imposed should "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  The recommended sentence would advance this goal.  It would deter future crimes by Toure, to ensure that her criminal conduct starts and ends with this one offense.  It would also send a clear message to others who might participate in business email compromise ("BEC") schemes: such conduct will not be tolerated, and those who exploit the Internet and our financial system to prey on innocent victims will face serious consequences, including jail time.

Given the ever-expanding creativity and ambition of the criminals who carry out these schemes, general deterrence is especially critical here.  Statistics published by the FBI's Internet Crime Complaint Center ("IC3") in 2019 show that BEC scams "continue[ ] to grow and evolve, targeting small, medium, and large business and personal transactions."  IC3 Alert Number I-091019-PSA, available at: https://www.ic3.gov/Media/Y2019/PSA190910.  The IC3 reported that between June 2016 and July 2019, over 166,000 victims collectively reported over *$26 billion* in domestic and international losses.  *Id.*  And the threat is growing: "Between May 2018 and July 2019, there was a 100 percent increase in identified global exposed losses."  *Id.*  With the Covid-19 pandemic, our reliance on online commerce has reached new heights – but this has also created new opportunities for BEC scammers.  The sentence imposed in this case should put those scammers on notice: if you get caught participating in such schemes, you will face a serious prison sentence.  The recommended sentence would do just that.

## CONCLUSION

For these reasons, taking all relevant factors into account, the government recommends that the Court sentence the Defendant to a term of imprisonment of 17 months, followed by 2 years of supervised release.

                                                    Respectfully submitted,

                                                    NATHANIEL R. MENDELL,
                                                    Acting United States Attorney

                       By:     */s/ William B. Brady*
                               Jordi de Llano
                               William B. Brady
                               Assistant U.S. Attorneys

Dated: April 2, 2021

## CERTIFICATE OF SERVICE

I hereby certify that, on the below date, this document was filed through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing.

                                                    */s/ William B. Brady*
                                                    William B. Brady
                                                    Assistant U.S. Attorney

Dated: April 2, 2021